Turn to the calendar. The first case on the calendar is Keith Hancock v. Elaine Young v. County of Rensselaer. You may proceed. Judge Walker, Judge Lohier, good morning. My name is Elmer Robert Keech III. I am proud to represent Keith Hancock, Jason Designew, and Tamara Thomas before this court in an appeal that I believe is of some importance to the rights of public employees in New York State. I'm going to start and simply address what I believe is the central question that's posed by this appeal, and that is whether under this court's precedent, public officials have carte blanche to illegally access a medical records database, go through that database, and look at their employees' health records, and then attempt to use those health records against them. In the absence of those health records implicating a more serious condition. That's not quite the question before us. You say carte blanche. I don't know if there's some other statute that may prohibit that conduct. But the question before us, as you put it, in your briefs, and as I understand it, is whether there's a constitutional right, 14th Amendment right, to privacy that attaches here in connection with the computer breach, for lack of a better word. I would agree, Your Honor, and that was what I was going to summarize at the end, is whether or not that conduct is permissible under the Constitution, and the right of privacy that has been. But it's not carte blanche. Well, the question is, is it carte blanche under the Constitution? Under the Constitution, under the 14th Amendment, under the implied right of privacy in the 14th Amendment, do public officials get to go access a computer database illegally and go surfing through their employees' medical records so they can use those records against them? And you are saying that they don't have the right, whether or not the illness being checked upon is stigmatizing or not? I would agree, Judge Pooler, that under the Madsen decision, that is a central question that has to be decided in this appeal. Whether or not there is. Your point is it's not the only question. I'm sorry? Your point is it's not the only question. I would agree, it's not the only question. What are the other questions? The other question would be, is there a balancing test that this court is going to apply in the context of . . . What are the considerations? I mean, most of the cases that have been decided look at the government interest as well as the degree of medical seriousness and possibility of stigma or discrimination in its disclosure. They also look at the government's interest. They look at the nature of the disclosure. It's part of the jurisprudence. Often, it's after they look at the seriousness of the offense, but it's still been considered by many judges. It seems to me that there's a series of considerations here that could bear on the question. One is the seriousness of the offense and the possibility of its stigmatization or possibility that there might lead to discrimination. There's the nature of the disclosure. First of all, if it's authorized, that's not a problem, but if it's unauthorized, then there could be a bad faith aspect to it. If that's the case, my question is, doesn't consideration of the seriousness of the illness kind of put the cart before the horse? Because the person who's accessing in bad faith may or may not find something that's stigmatizing. But you would argue, presumably, that the privacy violation is the same. That is, the records were accessed improperly, whether or not it's serious. Yes, Your Honor. That's stated much better than I could have summarized it, but I'll answer your question. I agree that looking at the seriousness of the medical records breach puts the cart before the horse. That you need to look at all of the surrounding facts involved. And if you have a public official illegally accessing a computer database with malicious intent to harm their public employees, and to harm their interests for workers' comp, to use sick leave, whatever it is. I mean, obviously, there are three plaintiffs here. This is part of a larger pattern. For any reason, it wouldn't have to be confined to public employees either, would it? I mean, if I had my records at some hospital, and somebody had it in for me, and somehow managed to go get the records, and wanted to see if there was something they could use against me. Maybe I had a position in public life or something of that sort, or wanted to run for office or something like that. Wouldn't that be a serious problem, too? Absolutely, Your Honor, and especially so under the 14th Amendment, if that person— So every breach, if you're going to say, no. My apologies, Mr. Vigilante. Every breach by a public official that results in obtaining some information, no matter what type of information, about a person, is a constitutional violation under the 14th Amendment. Of course, then you wouldn't have a balancing test. It would be a single test. No, I'm not arguing that. You're not arguing that. I'm not maintaining that. There are plenty of occasions where public officials in the decisions in this court and in the lower courts in the Second Circuit have discussed a number of legitimate reasons why the government would have to access this information. The best example would be— Every illegitimate reason, you're saying, would constitute a constitutional violation. It was under— It doesn't have to be a medical condition. It could be anything. No, I'm limiting my argument to medical conditions. So tell me what is the rule that you're asking us to apply? I think—I'm proposing that the court apply a balancing test and that one of the aspects of that balancing test be the legitimacy of the access and the intent of the access. Does that have to be done before access is made? I'm sorry, Judge Brewer? Does that have to be done before access is made? To whom is it done? I don't understand your question, ma'am. I'm sorry. Should the prison administrator have stated his reason or her reason for looking at these records to somebody or a supervisor before they access the records? Yes. I think they need to have a valid reason and a compelling reason to access the records. You go up and up and up, and then it would be just a different set of defendants here, right? I mean, someone would have approved it, or maybe they wouldn't have. This was part of a pattern in practice. The briefing details a number of different instances where this went on. It went on for scores of individuals. Do you know if the hospital was sanctioned? No. The hospital learned about it and cut off Nurse Young's access. But they weren't sanctioned afterwards for leaving the access? Not to my knowledge. They didn't know. They had a written agreement with Nurse Young that detailed the scope of her access, and then either certainly it was her because she admits doing it to another one of my clients, Charles Momroe, and getting into his mental health records, but either she did it or she allowed her password to be placed in such a place where people could go in and look at these things with impunity. Is this balancing test that you are asking us to apply in this case, as opposed to a test that proceeds in two parts, a threshold test plus the other factors, is that something that you would describe as clearly established in our law in Second Circuit, or is this up to some debate? I think under the Hope v. Pelzer decision from the Supreme Court, it certainly would make common sense that public officials in 2000. That's not the question. Is it clearly established for purposes of qualified immunity? I believe it's a close question. I would maintain it is clearly established. Why are they not entitled to qualified immunity? Because under the Hope v. Pelzer, the court can look beyond, can look also to state law and state regulation. No, no, no. Qualified immunity is by reference to our law or the Supreme Court law, and you just, in answer to Judge Walker's question, acknowledged that it was a close question, so why are they not entitled? As a matter of federal law, so why are they not then entitled to qualified immunity? Because there are statutory issues, both state and federal law, that the court can consider as part of that analysis, and it's, I mean, nobody that's a public official these days don't know about the requirements of HIPAA, even though that doesn't lead to an independent right of action. And there's also state law requirements that associate, that are involved with the privacy of these records that the court can look to under Hope v. Pelzer. Also, given the scope of access that the hospital gave to the prison, there would be a notice that you just can't do this. Yes, ma'am. Certainly this is grossly improper conduct. It goes to entitlement to qualified immunity, because they couldn't have believed, they couldn't have believed it was legitimate to do this, is what you're saying. I agree. Both under the access agreement and under federal and state statute, they could not have believed it was appropriate to do this. And certainly there's some discussion in the briefing about the efforts after the fact to cover it up and delay the disclosure. Would the situation be different if the records that were accessed were those of prisoners as opposed to public employees? No. I do not believe. Well, no, yes. In this instance, it certainly would be, because assuming that the access was done for continuity of care as required under the agreement, if, you know, a prisoner goes. Well, leaving that aside, don't prisoners have a lower expectation of privacy generally? They do, but if. It may not be eliminated altogether. You know, if a person would be subject to stigmatization or discrimination if it was revealed that they were transsexual. In fact, it might be worse in prison than it would be elsewhere. But I'm saying, I'm just talking about the expectation of privacy now. It is my opinion that a prisoner would enjoy significant privacy protections from this sort of breach. I know there's one example in Lieutenant Karam's deposition where one member of the Sheriff's Department got into those records to determine whether or not an inmate who he had met on the outside and had relations with was HIV positive. So, you know, there are a range of factual circumstances associated with prisoners that I think would be implicated by that sort of illegal breach. But certainly their expectation would be lower than a public employee who has given no authorization to their public employer to look into their records. Lower but still existent. I'm sorry, ma'am? Lower expectation of privacy, but still there is some. Yes, ma'am, absolutely. But here we're talking about employees, so a forciari. They had an expectation of privacy in their own medical records. Absolutely, Your Honor. They had an expectation of privacy in their medical records and those records. We're not talking here about prior authorization or that kind of thing. We're talking about looking at a breach or some access and then making an assessment after that about whether or not there was a constitutional violation. Isn't that? That's essentially what we're doing here. I mean, we're not looking at about to, you know, I mean, you're not suggesting that there be a requirement in advance to go give notice and have a hearing or anything of that sort, are you? We're looking at an after-the-fact breach. I'm not. Certainly there needs to be an appropriate justification. Most of the cases I think that this Court looked at, especially the Madsen case, there was authorization from the patient. Maybe there's some law enforcement reason why there could be some sort of access to medical records that is beyond the scope of what we're talking about. But under no circumstances should any public official, as Your Honor, Judge Walker, as you used in the example, if someone didn't like you and wanted to get into your records and they're a public official, there should be absolutely no justification for that sort of access, especially when, as Your Honor suggested in your hypothetical, that it's taken for malicious intent. And that's what was done here. What about the justification that the prison officials give is that they wanted to see if their workers were lying about sick leave? Then they can go through their employment agreement and get them to provide them with an authorization through their union and look at their records. Less restrictive means of checking on their employees' health. Absolutely. Without looking at their medical records. And even in a workers' compensation situation, in a 207C situation, those records would be reviewed by an independent mediator or arbitrator. They wouldn't be reviewed by the county. They wouldn't be reviewed by the sheriff's department. If you think your employee's lying, you confront them. You say, hey, I think you're lying about being sick. Give me a medical authorization. I want to see your medical records. Or bring in a doctor's note. Bring a note from a doctor, right? Yeah. Bring your doctor's note in. If there were a balancing, which we don't think there was, they would fail on the balancing because their interest is not compelling enough to allow them access to the medical records. Is that your argument? My argument is that they had no interest in getting into the medical records other than malicious intent, other than going through the back door to enforce a sick leave policy that was enforced against pregnant individuals, people with cancer, and they go through the back door with this back door access they have and make sure, hey, we're not going to have. . . That wouldn't be. . . Hey. If a balancing test was appropriate, the district judge didn't use one. So if we were to determine that a balancing test was appropriate, you may well predict how the judge might rule, but it would still be a matter for the district court on remand to apply the balancing test if there was one. Would that be true? I would agree that if Judge Mordew did not apply a balancing test . . . You'd be more than comfortable with vacating the judgment and remanding for further proceedings in accordance with some sort of balancing test than a reversal. I mean, there wouldn't be a reversal. I believe that the court, if it deems our appeal worthwhile and applies a balancing test to this case, that Judge Mordew should have an opportunity to apply that balancing test in further proceedings. Yes, sir. Would you just make sense for me of Mattson, and maybe your adversaries will do the same thing? Because in Mattson, we seem to have focused very much on the seriousness of the condition, fibromyalgia, as well as on the stigmatizing or not effect of that condition, and determined notwithstanding a breach, it seems to me, that there was no constitutional right to privacy that was implicated by the plaintiff's fibromyalgia in that case. I would agree that the Mattson decision focuses very closely on that question, Judge Lillie. I would, however, prospectively suggest that the Mattson decision also focused on the balancing test and made a balancing test of the need for the information. And in that case, you had an individual who was being a malingerer, who was claiming they had fibromyalgia. Based on, I think, the rule that you were asking us to embrace, or that you're asking us to at least entertain, it should have been open and shut in Mattson. That is a breach, a malicious breach, and that's it. I don't agree that it was a malicious breach in Mattson. The school board had a statutory authority to issue reports. The school board had the medical records through legitimate channels and gained access to those medical records through an authorization from the employee as part of an administrative proceeding where the employee had to process. The problem in Mattson was they issued the report and they put the name of the condition out there. And this court, looking at that, said, first off, fibromyalgia is not serious enough. And second, the school district has a statutory authority to issue these reports when the school district believes it's being defrauded. But in this case, the employees whose records were accessed didn't know that they were being accessed without their permission. That's absolutely correct. They did not learn it until several years later, although they did not learn it until several years later. And one gentleman, I haven't had a chance to talk about each of the individuals, but one gentleman had his records accessed after he had to have heart surgery. I would think, if we're going to look at the seriousness of the condition, at least his case would rise to the level as well as Tamara Hancock's birthing and gynecological records that apparently were also available. But, yeah, they didn't give access. They didn't give consent. They didn't even know about it. And here they are. Tamara Thomas goes out. Her hand gets crushed in a door. She applies for compensation as allowed under the law. The sheriff or someone in his direction gets into her records and says, ah, that's not serious. Get back to work. We're going to deny your 207C request. That is not how things should work. That does not comport with due process. It does not comport with the right of privacy. Prior to Mattson, there were some decisions by this court that seemed to suggest a balancing. I'm thinking of O'Connor against Pearson. And there the question was whether the school board was asking an employee to sign a broad medical release from granting it access to substance abuse records and other medical records. And we said that the individual had a privacy right in his records and that the board didn't have a sufficient interest in requesting them in that case. And we drew a distinction between requiring employees to undergo medical examination and requiring the records themselves, given that board members aren't medical experts. And so we found that the board's demand for the records was unconstitutionally arbitrary and really didn't discuss much the seriousness of the records, the nature of the records. And in a summary order later on, much later on, we said invading or intending to invade the privacy right of another person's medical record or mental health records would violate the employee's Fourteenth Amendment right if the employer's intent was driven by an intent to injure or out of spite. So we have taken into account the nature of the government's interest in the past in cases. Judge Raggi, when she was a district judge, did sort of a balancing test in a case in the Eastern District. And that was back in the year 2000. She said that there, the right to privacy's existence in a particular case depends on balancing the severity of the privacy invasion against the state interest in disclosure. So I think there are threads of this in our jurisprudence. It's just that we haven't announced a formal balancing test as such. I think in fairness, Your Honor, I also don't think the court has seen anything quite as outrageous as what happened here, where you have an elected sheriff illegally accessing a computer database to gain advantage over his employees by going through their records or someone doing it at his behest. That is, I would think that it would be very difficult for the sheriff to provide a compelling justification for that, and he doesn't have one. There is no justification for this. This was done out of spite. This is the argument, if we were to remand it, you'd be making to the district judge. It would be. It would be. You have to have, and I think the precedent in this court makes clear, you have to have a justification for what you're doing. And that justification will then enter into the balancing test. And if you have no justification other than spite towards your employees, other than malice towards your employees, then . . . Okay. I think we have your argument. All right. I understand. I've gone 14 minutes over time. But you have saved two minutes for rebuttal. That distinguishes Mattson. That's your point. Okay. Yes, sir. Thank you for hearing my arguments. Thank you. We'll hear from the defendants, the individual defendants, and the county of Rensselaer in a while. Good morning, Your Honors. I only . . . Good morning, Your Honors. I only represent Ms. Young, whose password was utilized to access the records. Until today, the standard has been set by the court in Mattson. Your Honors framed the issue in Mattson right in the very first paragraph of the analysis. And it was, does the Constitution protect Mattson's right to maintain the confidentiality of fibromyalgia? That was the threshold issue that was . . . You mean it was limited to that disease? It was limited to the examination of the condition to determine whether that particular condition is one that is constitutional protection from . . . Do you think what we take from Mattson is that every disease has to be analyzed for its stigmatization potential? I do, Your Honor. In fact, the case says that every one of the cases would be examined on a case-by-case basis. Every condition would be . . . Why is the privacy right dependent upon the nature of the illness when the concern is . . . There are other concerns, which is the government's interest in obtaining the information, and whether the access was done in bad faith or not. Why aren't those relevant considerations? I believe that HIPAA law protects the confidentiality of medical records and provides a remedy for those whose rights have been violated in terms of access to those records. It's statutory. Common law negligence allows a claim to be brought for someone who has been wronged by some improper or negligent action on the part of a public official, such as this case. In getting to the constitutional level, there has to be some threshold. For example, if the boss in the state agency learns that the employee is out sick with a virus, and at the water cooler says to HR, you know, Sally's homesick with a virus, under the analysis you're being asked to approve today, the balancing test, there is going to be a constitutional analysis. Was the virus a condition that should be protected? What was the government's interest? The bigger question is why shouldn't that consideration, those factors, the seriousness of the condition and so on, be placed as a matter of balancing in the context of the need for the government officials to get that information in the first place? So, for example, if it's purely malicious, why shouldn't a court be required as a constitutional matter to consider that fact, notwithstanding the fact that it's a very minor condition that, by happenstance, is at issue? It could have been that any of these plaintiffs had some much more stigmatizing condition. It just happened to be that they found a heart condition, a hurt hand, and so on. So why shouldn't that be part of the balance, that is, the rationale, the reason for the breach in the first place? The historical stare decisis reason is that, in Matson, this court says it would not extend constitutional protections to all medical conditions. It required, in the first instance, a threshold, and it had... Who said Ms. Young? It was her computer, right? It was not her computer. It was a password, and the facts are somewhat in her favor because it was a password that she had that other people used, and she taped it to her desk. It was Young's password? It was her password. She's the one that taped it right next to the computer? She taped it in her drawer. Her drawer would open up and people could access it. Everyone knew where it was, right? Well, all the nurses needed access to the records. She didn't work all the time. So everyone knew where it was. That's a yes? Her nursing staff did, yes. So it was negligence, maybe, on her part. It wasn't willfulness. In other words, she wasn't deliberately disclosing anything in order for others to misuse it, is what you're saying. That's correct, Your Honor. Why wouldn't that be part of a balancing, the nature of the access? And if the access was not done in bad faith or for malicious purposes, that would be a factor. Because I believe you have to start with a threshold type of medical condition. Because not every medical condition would be. I understand that. But the problem with doing that is that it seems that the medical condition is something that the person gaining access wouldn't know about. And so they're breaching some right of confidentiality. Maybe it's a HIPAA right. But it's some right of confidentiality that everybody has in medical records and that our society has recognized. And she's arguably violating the HIPAA law. And she's arguably violating a contract that the jail had with Samaritan Hospital. That's what she's doing. We draw, we look at determining rights and obligations from a constitutional perspective into generally accepted traditional behavior and expectations very often. And certainly medical privacy is at the height of confidentiality in this country. Everybody expects their medical records to be kept confidential. Across the board, HIPAA or no HIPAA, right? 100% agree, Your Honor. The question then becomes whether it rises to a constitutional protection. Right. And nobody's suggesting that if somebody had access through negligence and looked at a record and found, you know, somebody had a splinter pulled out, that that would rise to a constitutional level. That would be something that would be taken into account in the balancing. And therefore, you wouldn't just have necessarily a privacy violation of a constitutional nature in every case. But it would depend on the circumstances. We have balancing tests occur all the time. I mean, we have them in due process. We have them in every aspect of constitutional law here. And we indeed have looked at various factors other than justice severity in various considerations. Your Honor, I would submit— The right of privacy—I mean, the expectation of privacy is also relevant, isn't it? Because if these had been prisoners, you're in a different situation than you are with employees. Your Honor, I'm not disputing that there is a right of privacy that extends to the confidentiality of medical condition. One's medical condition. Medical records are separate, but medical condition. There is a right. But the framing of the issue in Mattson told us that the issue is what is the medical condition. That's a threshold question. It's analyzed that. There is no balancing done in Mattson. If we were to craft or come up with a formulation that accounted for Mattson but also accounted for other decisions that may have been pre-Mattson and so forth that was more of a balancing nature, then you would be in a position to argue that this was not clearly established law at the time that these individuals did what they did, right? We would certainly argue that Mattson is the established law. That's the law that we operated under. But short of that, I think Judge Walker is asking you a good question. You would agree that if we disagreed about Mattson, say, that at the very least it's not clearly established law. I agree, Your Honor. So you might be entitled to or your clients might be entitled to qualified immunity. But your principal point, I take it, is that Mattson actually dealt with and very carefully considered O'Connor, which was authored by an exceptional member of our court, and thought about whether you could have a balancing test and decided that, at least with respect to some medical conditions, a constitutional right of privacy may not attach. And that was our holding in that case, in your view. Yes, it was, Your Honor. Don't you have to look at what illness is being considered? Don't you let the cat out of the bag before your need is tested? You just look at the records and you say, oops, this is one we shouldn't have looked at. And then you find one, well, this is good, this is stigmatizing. And don't you get to the records before you make your justification? The records are protected by the HIPAA laws, which gives a remedy for somebody who's wrong, and that remedy lies with the government to pursue that remedy. With respect to the condition, which is separate, the condition has to be one that's constitutionally protected under the right of privacy, and not every medical condition is or can be, which is the ruling of any court thus far. So you don't accept that everyone has a right to confidentiality in their own medical records? They have a statutory right, Your Honor. I do agree with that. You do agree with that? They have a statutory right to privacy under the law. And what about the rules that the hospital imposed on the use of their information at the prison, which Mr. Keech told us about, so that everyone who accessed it was breaking the contract with the hospital? They did break the contract with the hospital. They did. But just to be clear, the record shows that Mr. Hancock, his first client, came to my client and said, I have a laboratory report, can you look it up for me? She looked it up for him, told him what his lab report says. That's the facts, the different facts on that one. The other two, she denies having anything to do with, her password was used by someone else. That's one of those days she wasn't even working. Was the agreement with the hospital well publicized? Did everyone who accessed this computer know that it was a violation of the contract with the hospital? I don't know that. I know that my client knew that it was a violation of the contract. So there can't be qualified immunity, right? Because she knew no reasonable person would think you can access this computer just because you wanted the information that was in it. She did not access it. The only breach that she did would have been for Mr. Hancock who requested that she do it. The other one she denies even doing. So to say that she knew it when she says, I didn't do the access, I didn't make the access, I wasn't working that day, means that she knows that there's a contract that exists, but she's not violating that contract. Well, isn't she violating the contract by taping her password to the inside of her drawer and everyone knew where she'd put it? Not everyone, Your Honor. Just the nursing staff, which has its own obligations to maintain confidentiality. There were three nursing stations. She had the password at one in a drawer so that when she was not working and an inmate is injured or at jail that the nurse who's on duty could access the medical records and determine whatever they needed to determine at the time, if they had some medical condition or some blood condition and how to treat them at the jail. Let me just sum up. Do you believe that every person, whether in prison or working in a prison or just sitting here on the bench, has a right to the privacy of their medical records? I believe they have a HIPAA right to the privacy of their medical records. I'm not talking about HIPAA. I'm just talking about the basic constitutional right to be left alone, to have the privacy in your records. Don't you believe in that? I do not believe in a constitutional right to privacy of everything and anyone in someone's medical records. I do not believe that that's what the cases tell us, that it's limited to a constitutional right to serious medical conditions or medical conditions that would cause a stigmatization or undue embarrassment to someone. Is there anything wrong going forward with a test that says, well, we said in Mattson that the type of analysis necessarily will include certain medical conditions but will exclude others. Is there anything wrong with adding a little codicil to that, which is that when there is an instance of truly egregious government conduct, then we ought to consider that? Because here part of the problem is that it's a haphazard test. It just turns out that notwithstanding the egregiousness of the government conduct, the condition that the government ultimately learns about is very minor when they were looking for something maybe more serious. But part of these constitutional tests are designed to deter. So is there anything wrong with going forward with a test that adds that as a necessary factor to clarify or to slightly expand maybe what we said in Mattson? I can't answer that question. I think that the legislature has addressed the HIPAA laws. They've protected the right to privacy of medical records. I'm not talking about the HIPAA laws. I'm talking about the constitutional principles here. If a constitutional analysis is conducted, whether there's a balancing test or not, a threshold question would still be what's the seriousness of the condition? I don't think you can punish just conduct. You don't know the seriousness of the condition until you violate the person's constitutional right to privacy in his or her medical records. Isn't that correct? It's not what Mattson says, Your Honor. It says does the Constitution protect the right to maintain the confidentiality of the disease of the condition? That's the first question. That's obviously a tautology. You have to find out what the disease is before you believe a constitutional right arises. That's like being a little bit pregnant. You have a constitutional right or you don't. It's the confidentiality of the medical condition that Your Honors have sought to protect through the 14th Amendment. That's what we're applying. We apply that. It's not every condition. It's certain conditions. Certain conditions. Yes, Your Honor. All right, thank you. We'll hear from the county. Good morning. My name is James Rosilla, and I represent the county of former Sheriff Mehar and David Hetman. I agree with what Mr. Louisbrand said about Mattson, and I believe the question is from a 14th Amendment perspective, each individual has their rights, and their rights in certain conditions. And I believe Mattson in the Second Circuit case law says you have to look at the condition to determine whether that person has a right relative to that condition. It seems to me, counsel, with all due respect, absurd that you determine, after you have violated the constitutional rights of the person, after you've found out what the disease is, then you decide whether a constitutional right arises. That is just backwards. I believe that's what Mattson says, and I think that's what the cases that have interpreted Mattson have said. I believe after you get past that question, then you get into the balancing of what business did the government have. Was it disclosed, or was it just accessed? You're saying that the balancing, you only get into that when you have a disclosure of a serious illness that creates a stigma or is a basis for discrimination. So within that universe is all that you're looking at, and what we're suggesting is that egregious behavior on the part of the government that maybe discloses medical information that doesn't have the same stigma or the same ability to cause discrimination, but is still significant, would not be actionable. That's what you're saying, and that seems odd. I believe that would make it HIPAA-related matter, but as I read Mattson, and I believe your Honor has asked this question, about whether if something else is brought into the analysis, I believe that my clients, the individual clients, are entitled to qualified immunity. There is a sort of shocks the conscience kind of aspect to this that comes up. Suppose these people, Ms. Young was assiduous in keeping these records confidential and didn't tape it, but she knew the combination. These officers abused her, even tortured her, in order to get that information because they wanted to use it for their own nefarious purposes. Your position would be no constitutional right of privacy as far as this fellow with the heart condition is concerned, but that's an extreme example of something that would shock the conscience of a government actor going that way. But it seems to me that that's something that the law takes into account and it's also something that the Constitution takes into account. And why shouldn't we be looking at the nature of the right and the nature of the unauthorized access as part of the picture? That's all I'm asking. That's all I'm suggesting. Not the complete picture, but part of it. I think it becomes part of the picture after you get past that first question. I understand you're saying that, but that's not really answering my question as to why it's an ipsy-dixit with you. I believe, as Mr. Luderman said as well, that you've got your HIPAA law, which protects disclosures, and then you have the Constitution, which is for a more serious situation. And it's only a question of the 14th Amendment right to privacy. If there's some other outrageous conduct that may have some other cause of action, some other claim under 1983 that can be brought, then so be it. So one way, I mean, your adversary pointed out that Matson did not include this sort of egregious conduct, so the panel in that case didn't have to grapple with that issue. Is that right? I believe so. I believe it was a request. Actually, what they did was they actually disclosed information about this person's condition, and it was politically motivated. So in our case, there was access. There was no disclosure outside of, so far as we know, to anyone. So I would submit that... Wait, you've just identified something else. Doesn't that sort of function with the nature of the disclosure? Suppose somebody takes medical information improperly and then sees it and then just decides to go and publish it or make some public statement about it in a campaign or something of that sort. I believe that has happened in some of the cases, and I believe... That's a violation of the person's right of privacy. It doesn't start, it isn't just the disclosure, initial disclosure. It's what happens afterwards. It becomes less and less and less private as more disclosure occurs. And I believe even in the egregiousness of a situation like that, they still look at the medical condition. And when it was used for untoward gain, if the medical condition is not one of those serious conditions that is subject to protection, as the case law states, they don't have a 14th Amendment claim. Even if the government officials disseminate that disclosure to the world? It depends on the condition, I believe, yes. They may have done something else, but not... I'm sorry. They may have done something else wrong, but not a violation of the 14th Amendment right to privacy. Well, it also depends on whether there's opprobrium or discrimination as a result of it or it becomes a stigma. It also depends on the nature of the circumstances in which it's disclosed. Doesn't it? I mean, if it's in a political context, it could be very different from another context. If it's a celebrity, it could be something. There are all sorts of different permutations that could occur that affect the nature of the disclosure as well. And the nature of the disclosure would shed light on the degree of privacy violation. I believe you're correct. In this case, there was no disclosure to any outside party. Right. That's a good point. I know that's a good point. That's a great point that I hope I'd ever have to make. So, yes. And so I think you've mentioned the qualified immunity points. That's in my brief. I'm not going to restate it, but if there is a new test that comes out of this case, I don't think it should result in my individual client's detriment. And then there was also the Computer Fraud Abuse Act cause of action, which was dismissed under Rule 12. We submit that there was no evidence of any computer-related damages that went to a $5,000 threshold so as to give the plaintiff a cause of action. Thank you. Thank you. Mr. Keech, you reserve two minutes for rebuttal. Before you draw your first breath, I have one question following up on something Mr. Lewebrand said. You have no objection to the nurses who were treating prisoners for continuing diseases or were sending them to the hospital. You have no problem with them accessing the computer, right? No. No problem at all. to check on whether his employees were lying about sick leave. Yes, that is. So if you do that balancing ab initio, that's not a legitimate reason. That's what you're arguing, right? Yes. Because he had other less restrictive means of doing it. Give me a doctor's note. Give me a doctor's note. We'll go through the union process and get medical authorizations. He did this behind their back without them knowing, out of malice, out of spite. This went on for mental health records, a 12-year-old girl. Under this analysis, however, access would not be, no one would, there wouldn't be access if he didn't justify a reason that, a straight-faced reason that everyone would agree was legitimate. I don't know who he would justify it to, but he has to know that it's illegitimate to access this to check on whether an employee is lying. Absolutely, and that's why he worked to cover it up, and that was detailed in the brief where there was a period of delay where he didn't want people from Samaritan Hospital to notify these individuals because he didn't want them to learn what had happened because he knew he was going to get sued. But the person's access is perfectly fine, right? It's part of what they're doing. Absolutely, it's perfectly fine. Do you believe that Matson was wrongly decided? I believe that Matson, well, you're putting me in the awkward position of criticizing another panel, but . . . It hasn't stopped others in the past. Well, it's not how I would . . . . . . wrongly decided and a more myopic attack on a particular problem than might have been warranted in the larger context. I would agree, Judge Walker. That question, yes. I would agree, Judge Walker. I think that Judge Straub's dissent in that case detailed some of the problems that were going to flow from that decision. Do you think that the majority . . . It's no problem. We're adults. Do you think that the majority got it wrong? I think the majority should have rounded off the corners of their decision a little better. Was Matson wrongly decided? Very simple question. Yes. I believe that Matson, in terms of doing a two-part analysis where the seriousness of the health condition is considered first in the absence of any balancing, was wrongly decided. Do you think we should overturn Matson in this case? No, I don't believe Matson needs to be overturned. I think the Court has other precedent that apply the balancing test . . . No, no, but Matson subsumes O'Connor, all of this other precedent that you're relying on. That's the last case. That's the last relevant case. So you think that we should . . . That's what we do perfectly well. We know how to cabinet and say this is the facts of Matson. But in a broader concept, it shouldn't apply. I would agree. Judge Puller, that is . . . What do you make of the following? This type of . . . This is the language from Matson. In considering claims that a constitutional right of privacy attaches to various serious medical conditions, we also proceed on a case-by-case basis. In doing so, we examine all the relevant factors that cut both in favor of and against extending privacy protection to such medical conditions. This type of analysis necessarily will include certain medical conditions, but will exclude others. I agree that's what the decision says. Well, that sounds like a balancing test to me, but with caveats that some medical conditions are going to trump because they're so serious, and others will be so minor that they're not going to result in any violation. I believe that Matson does, perhaps inartfully, apply a balancing test. And I'm also cognizant, Judge Lowy, that this panel does not have the ability on its own to overrule a prior panel. That has to be done en banc. I don't believe that needs to . . . I respectfully suggest that does not need to occur here because the Matson decision does balance out the need and the seriousness of the medical condition. But it tells us exactly what you say we should not do, which is look at the seriousness of the condition. Some might be excluded. Are you suggesting that? I didn't think that that was . . . I'm not suggesting you don't look at the seriousness. I thought the seriousness of the condition was very important to the balance. I'm not suggesting that you look . . . I'm not suggesting that you don't consider the seriousness of the condition. I think Mr. Lewebrand, in his argument, talked about if, you know, a school nurse calls the doctor and says, Hey, does Janie really have a cold? And the nurse says, Yeah. You know, is that going to rise to the level of a constitutional violation? I would think not. We should, in that case, conduct a full-blown analysis with all of the relevant factors as opposed to saying, you know, the fact that someone's got a . . . whether or not someone's got a cold is just not . . . does not rise to a constitutional violation. I think it's like anything else. And, you know, these balancing tests have been put in place by the Supreme Court and by this court for a reason. You've got to look at everything, and then the court has to look and balance the importance of the right versus the need for the information versus the harm that was caused or the potential harm that was caused. And certainly, in terms of using Mr. Lewebrand's example of the school secretary, whether that represents a constitutional violation or not, I don't know. That's certainly not a case I would take as a plaintiff's civil rights lawyer, but that's a far cry from what happened here, which is a sheriff, an elected official . . . Look, I'm sympathetic to everything . . . I'm sorry. I'm sorry, Your Honor. I'm sympathetic to your client, so you don't need to get upset. I get excited. Well, I apologize. But the problem, it seems to me, is Mattson, and the problem is a qualified immunity problem. I don't . . . I respectfully suggest that that is not a significant hurdle to the court issuing a ruling requiring a balancing test in this case. I also respectfully maintain that the district court didn't decide qualified immunity in its decision. So that kind of goes back to the same question about remand. Well, that's not stopped us in the past, but . . . okay. All right. And I've gone over . . . well over my time, and I appreciate the court's courtesy to me. I would like to add just on the CFFA issue, or CFAA issue, that this is the type of situation that can cause the modification or impairment of a medical diagnosis, especially as it relates to Mr. Desenu, who had the heart problem. You know, they went in and surfed through his records and told him to come back to work, at the same time that, you know, forced a guy to come back to work who just had heart surgery. That's pretty outrageous, and I believe that is certainly one component of a CFAA violation. It's just been my pleasure, Your Honors, this morning. Thank you. Thank you all for a lively argument. We'll reserve decision.